```
                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA

                   CASE NO. 09-60027-CIV-ZLOCH

GREEN BULLION FINANCIAL
SERVICES, LLC,

          Plaintiff,
                                             O R D E R
vs.

MONEY4GOLD HOLDINGS, INC., and
DOES 1-10,

          Defendants.
                                    /
```

THIS MATTER is before the Court upon Plaintiff Green Bullion Financial Services, LLC's Motion For Preliminary Injunction (DE 8). An evidentiary hearing was held before the undersigned on Plaintiff's aforementioned Motion on April 21, 22, and 23, and May 11, 2009. The Court has carefully reviewed said Motion and the entire court file and is otherwise fully advised in the premises.

Plaintiff is a successful company operating under the name Cash4Gold. Its business model consists of customers sending their unwanted jewelry or other precious metals to Plaintiff in exchange for payment of a fraction of the value of the jewelry or metal. The metal is refined and disposed of for a profit. Incidentally, gold is hovering at close to a thousand dollars an ounce at the time of this Order, and much of Plaintiff's success is the product of good timing, hard work, and effective advertising. In fact, it has spent tens of millions of dollars on building the Cash4Gold brand with a massive campaign of effective and sometimes humorous advertising.

Defendant Money4Gold is in the same business as Plaintiff. Its moniker is Dollars4Gold.  In order to capture part of Plaintiff's overwhelming market share, Defendant has also engaged in a large advertising campaign, mostly waged on the internet. Part of this campaign consisted of Defendant contracting with advertising companies to post banners and logos on Google and other websites that attracted customers to Defendant's website.

Many of these banners and logos took Plaintiff's advertising efforts and brand and attributed them to Defendant.  For example, one advertisement on Google placed on behalf of Defendant asked whether consumers had seen Defendant's Super Bowl commercial. Defendant, however, did not run an ad during the Super Bowl, but Plaintiff did.  Other websites placed by Defendant's sub-affiliates directly stole Plaintiff's operating name and logo.  Clicking on these sites would direct consumers to Defendant's website.

A basic sense of fairness makes one recoil at Defendant's actions.  However, "that's not right" is not a legal principal. Instead, intellectual property law is concerned with nuanced formulas and tests that determine whether Plaintiff is protected from Defendant's manner of competition.  The Court is bound by these tests and must apply them in this action. In walking through the analysis and applying the facts adduced at the hearing to the law, the Court finds that Plaintiff has failed to meet its burden for a preliminary injunction.

I.

The evidentiary hearing established the following facts. Plaintiff, doing business as Cash4Gold, operates its successful direct-buy precious metals purchasing business. Plaintiff, especially its Chief Executive Officer Jeff Aronson, has worked very hard to build the company up from scratch and is now a leader in the field of direct-buy precious metal refining. In the run-up to its present market status, Plaintiff began advertising on cable television stations in May of 2007. Its commercials are shown on multiple stations at all hours of the day. Plaintiff also has a weekly advertisement on the Howard Stern radio program, a scripted advertisement spoken by the host and airing since late 2007. It also advertises on other radio programs. In early- to mid-2008, Plaintiff began sponsoring a NASCAR driver named Brandon Knupp by emblazoning its logo and phone number on several prominent locations of his car. Finally, at some point Defendant became a corporate sponsor for the Washington Wizards professional basketball team. Defendant's logo is included in a set of corporate sponsors. Pl. Ex. 7.

In addition to these more traditional efforts, Plaintiff also uses an advertising method known as affiliate advertising, which works in this way: the seller of a product or service, known as the advertiser, hires a company known as a network affiliate to place advertisements on internet websites. The actual advertisements appear as banners or logos on websites that are not necessarily connected in any way with either the advertiser or the network

3

affiliate.  The following example illustrates how the process works: an internet user might go to the New York Times website and notice a banner at the top advertising the widgets sold by the advertiser's company.  If the user clicks on the banner, he is redirected, in the examples discussed at the evidentiary hearing, to a webpage acting simply as a more robust advertisement.  This webpage might have catch phrases and mottos and display a place to click to order.  Clicking here redirects the user to the website of the advertiser, where he can engage its services.

The electronic banner advertisements and logos are created and placed on websites such as the New York Times by people employed by the network affiliate, known as sub-affiliates.  The raw electronic material for the advertisements are drawn from a bank hosted by the network affiliate that contains content, sometimes called "creatives," pre-approved by the advertiser for use in this way.  The creatives include names, words, mottos, pictures, logos, designs, trademarks, and the like that the advertiser uses in its trade even apart from affiliate advertising.

Sub-affiliates also place advertisements on Google's search engine.  These take the form of links appearing at the top or right side of the list of retrieved webpages after a search query is run.  The advertisement in this method consists only of a line or two of text that advertises the service or product and displays the website and includes a link to the same.

Many network affiliates, including the one used by Plaintiff, do not disclose the names of their sub-affiliates.  Thus,

advertisers deal only with the network affiliate and have no dealings with sub-affiliates.  Based on the manner in which the banner advertisements are put together behind closed doors without receiving approval for their final form from either the network affiliate or the advertiser, and the method of placing them on webpages, sub-affiliates sometimes create and place non-approved advertisements.  This includes both banner advertisements and the sponsored links on Google.  Advertisers have both the duty and incentive to contact the network affiliate if they become aware of advertisements containing non-approved or possibly infringing content.

By April of 2008, Plaintiff had obtained a fair amount of press coverage.  Timing is everything in business and life; Plaintiff's emergence into the unwanted-jewelry buying market coincided serendipitously with the downturn in the economy and the rising price of gold.  By late 2008, and continuing to this day, Plaintiff has become widely known.  In fact, Plaintiff was the only company of its kind to advertise in a nationally broadcast commercial in this year's Super Bowl, an achievement recognized as stunning to anyone familiar with the companies who advertise year after year in that venue.

Defendant Money4Gold Holdings, Inc. operates in the same business field as Plaintiff and provides the same services to its customers.  It advertises by using the same network affiliate model as Plaintiff.  At issue in this case are sponsored links on Google and several webpages that Plaintiff claims infringe on its

5

federally protected trademarks and copyrights. The websites and sponsored links advertise Defendant's company and were placed by the sub-affiliates of Defendant's network affiliate.[1] Plaintiff filed this action both to protect its intellectual property rights and to redress the injuries it suffered by Defendant's conduct. The instant Motion seeks an order enjoining Defendant from continuing to operate the websites and Google links pending resolution of this matter.

## II.

A preliminary injunction should be granted if Plaintiff can establish (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable harm in the absence of an injunction, (3) the harm to be suffered by Plaintiff would outweigh the harm suffered by Defendant if the injunction were to issue, and (4) the injunction would not disserve the public interest. <u>N. Am. Medical Corp. v. Axiom Worldwide, Inc.</u>, 522 F.3d 1211, 1217 (11th Cir. 2008).

### Copyright Claims

Plaintiff claims that Defendant is infringing on its copyrighted website by maintaining the websites discussed above and created by sub-affiliates. "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). To prevail on a copyright claim,

---

[1] The Court will assume for purposes of the instant Motion only that the websites and sponsored links at issue were the advertisements of Defendant.

6

Plaintiff must prove (1) ownership of a valid copyright and (2) copying by Defendant of constituent elements of the work that are original. Southern Bell Tel. and Tel. Co. v. Associated Tel. Directory Publishers, 756 F.2d 801, 810 (11th Cir. 1985); see also Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 345 (1991) (noting that authorship of an original work is the sine qua non of copyright).

Plaintiff obtained a Certificate of Registration (Pl. Ex. 4) from the United States Copyright Office for its website (Pl. Ex. 5), which is prima facie evidence of the copyrightability of a work. Southern Bell, 756 F.2d at 811. Thus, for purposes of the instant Motion, the focus will be on the behavior of Defendant.

In absence of direct proof of copying, to establish a case of copyright infringement Plaintiff must establish both that Defendant had access to Plaintiff's website and that the two works are substantially similar. Oravec v. Sunny Isles Luxury Ventures, L.C., 527 F.3d 1218, 1223 (11th Cir. 2008) (quotation omitted). Given that anyone with access to the internet had access to Plaintiff's website, the Court will focus on the element of similarity. Substantial similarity exists when the lay observer would recognize a defendant's work as appropriating a plaintiff's copyrighted work. Id. at 1224. It is only the protected portion of Plaintiff's work that is relevant in an infringement action, not the unprotected portions of the work. BellSouth Adver. & Publ'g Corp. v. Donnelly Info. Publ'g, Inc., 999 F.2d 1436, 1445 n.22 (11th Cir. 1993) (quotation omitted).

Plaintiff introduced into evidence the several websites it argues infringe on the copyright it owns. Pl. Ex. Nos. 21, 26, 30, 31, & 33. First, the websites introduced at Plaintiff's Exhibit 26, which is <www.themostcash4gold.com>, and Exhibit 33 obviously pilfer the words and stylized font and colors of the "Cash4Gold" mark, but these items alone cannot make out a claim for copyright infringement. Other than the logo and other generic items such as the "3 Easy Steps" concept and the "100% Satisfaction Guaranteed" seal, neither of which strike the Court as original to Plaintiff, the websites at Plaintiff's Exhibits 26 and 33 bear little resemblance to Plaintiff's website (Pl. Ex. 5). Thus, the Court finds that they are not substantially similar to Plaintiff's website.

The same can be said for the websites introduced at Plaintiff's Exhibits 30 and 31, except that they incorporated "Cash4Gold," but without the stylized font and colors. Even so, these websites have a strikingly different look to them from Plaintiff's site and would not strike a lay observer as having appropriated the protected elements of Plaintiff's website. Oravec, 527 F.3d at 1224. Finally, the Court finds that the website introduced at Plaintiff's Exhibit 21, which incorporates no mark of Plaintiff, bears little resemblance to, and is thus not substantially similar to, Plaintiff's site.

Moreover, the copy of Plaintiff's website introduced into evidence (Pl. Ex. 5) is 43 pages long. All of the "spoof sites" and Defendant's sites are only one to three pages each. Thus, even

if they were similar to Plaintiff's site, which they are not, they would not be <u>substantially</u> so.  See <u>Peter Letterese and Associates, Inc. v. World Institute of Scientology Enterprises</u>, 533 F.3d 1287, 1307 (11th Cir. 2008) (noting that "it is the relative portion of the copyrighted work--not the relative portion of the infringing work--that is the relevant comparison"); <u>see also</u> 4 <u>Nimmer on Copyright</u> § 13.03 (2008) ("The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work--not whether such material constitutes a substantial portion of defendant's work.").  Thus, Plaintiff's claim of copyright infringement by Defendant's supposed appropriation of the language used in its "3 Easy Steps," <u>see</u> Pl. Ex. 34, is unavailing.  This is but a fragment of the original material in Plaintiff's website and cannot constitute substantial similarity.

Therefore, the Court does not find a substantial likelihood of success on the merits of the question of substantial similarity for Plaintiff's copyright claims because the websites complained of would not strike a lay observer as appropriating Plaintiff's protected website.  <u>Oravec</u>, 527 F.3d at 1224.[2]

---

[2] There was much testimony regarding the names for the envelopes used by Plaintiff and Defendant in their respective businesses.  Plaintiff uses the term "Refiner's Return Kit," and Defendant uses the term "G-Pak."  The Court notes the mildly amusing irony that Plaintiff's website contains the phrase "Track Your Pak!" in the top banner.  <u>See</u> Pl. Ex. 5.

9

<u>Trademark Claims - False Designation</u>

Plaintiff next claims that Defendant is engaging in trademark infringement by creating a false designation of origin of its services. This claim is established by demonstrating a likelihood of confusion for the consumer between Plaintiff's marks and the marks used by Defendant. 15 U.S.C. § 1125(a)(1).[3] Courts in the Eleventh Circuit consider these factors when analyzing false designation of origin claims:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion.

<u>Alliance Metals, Inc. of Atlanta v. Hinely Indus., Inc.</u>, 222 F.3d 895, 907 (11th Cir. 2000). Normally these factors are considered as a whole, but, as will be seen below, the first factor is at times dispositive.

Regarding the third, fourth, and fifth factors, evidence at the hearing established that the Parties offer basically the same

---

[3] As for Defendant's repeated assertion that Plaintiff has not pled a trademark claim in the Complaint because it proceeds under § 43 of the Lanham Act and not § 32, the Court dismisses it out of hand. "Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill." <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23, 31 (2003); <u>see also</u> J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 27:14 (4th ed. 2009) (noting that "[s]ection 43(a) has proven particularly useful to attain federal jurisdiction in cases involving infringement of unregistered marks").

service, by the same sales methods, using nearly the same advertising methods--advertising on internet websites. As for the second factor, in so far as Plaintiff complains of the use of its very marks, the similarity between Plaintiff's mark and the allegedly infringing mark is, to say the least, high. There was evidence introduced that would support a finding that Defendant intended to cause confusion. See, e.g., Pl. Ex. 55, p. 11. Thus, the sixth factor could favor Plaintiff as well. There was no evidence offered as to the seventh factor, actual confusion. Thus, the Court now turns to the first factor, the strength of Plaintiff's mark.

A trademark's strength is determined in two steps: first, its distinctiveness; second, its strength in the marketplace. The trademark at issue in this case is the word mark "Cash4Gold" and a stylized logo bearing the same words. The Parties agree that the mark is not inherently distinctive but is a descriptive word mark because it describes the service being provided: we give you cash for gold. Thus, the instant Motion stands or falls on this ground alone. Because the mark is descriptive, to be worthy of protection Plaintiff must show that "Cash4Gold" has acquired "secondary meaning." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:14, 27:18 (4th ed. 2009). If it has not acquired secondary meaning, alleged infringement of the same is not actionable under § 43(a) of the Lanham Act. Id. §§ 27:14, 27:18.

Secondary meaning is the association made by the public between a company and its otherwise descriptive trademark. In

other words, when a mark has acquired secondary meaning, it no longer is descriptive of the good or service provided but comes to signify the owner of the mark specifically.  "It is impossible to lay down any generalized rule as to the minimum amount of distinctiveness necessary to achieve secondary meaning in a mark. . . . .  However, as a general rule of thumb, the more descriptive the term, the greater the evidentiary burden to establish secondary meaning."  McCarthy, supra § 15:28.

The analysis of whether a mark has acquired secondary meaning focuses on four factors: (1) the length and manner of the mark's use, (2) the nature and extent of advertising, (3) efforts made by plaintiff to promote a conscious connection in the public's mind between the mark and the service provided, and (4) the extent to which the public actually identifies the mark with the plaintiff's venture.  Conagra, Inc. v. Singleton, 743 F.2d 1508, 1513 (11th Cir. 1984).  No one factor is a game changer; a plaintiff must address all of these factors and make a showing as to how the evidence supports each.

Proof of secondary meaning as of a certain point in time is important.  When a mark has already obtained secondary meaning, future encroachments on it are labeled infringement.  When a mark has not yet obtained secondary meaning, the descriptive term is not protected and may be used freely by others.  This point, the timing of obtaining secondary meaning, is central to the Court's analysis.  Conagra demands that a mark obtain secondary meaning before any encroachment on it by others.  Here, the timing of Plaintiff's rise

to prominence spanned a several month window in which Defendant began appropriating its brands and other property.

Plaintiff stipulated at the hearing that it must establish that it had secondary meaning for its mark before September of 2008, when Defendant allegedly began infringing.  At the hearing Plaintiff relied on circumstantial evidence to demonstrate secondary meaning for its mark.  While offering circumstantial evidence is a perfectly legitimate method of proving secondary meaning, Plaintiff's presentation did not tick through the factors of establishing the same, though the Court will address them. Plaintiff launched its company in April of 2007 and began using the mark "Cash4Gold" immediately.  Thus, there is a maximum of eighteen months of use before September of 2008.  Regarding the manner of its use, the evidence established the following.  First, Plaintiff has advertised on the radio program hosted by Howard Stern weekly since "late 2007."  While the Court is not blind to the fact that Mr. Stern is a generally well known individual, there was no evidence introduced as to the listenership of his radio program or the return Plaintiff has received on this investment.  Thus, the Court has no basis to make any sort of conclusive finding on the first, third, and fourth <u>Conagra</u> factors regarding the Howard Stern advertisements.  Plaintiff also advertises on other radio stations. This point was undeveloped.

Second, Plaintiff has advertised in the form of television commercials since May of 2007.  The commercials ran at all hours of the day in all fifty states on several "major" cable stations, but

no evidence was offered as to the exact extent of the advertising before September of 2008, nor the exact stations or their ratings. Plaintiff's CEO Jeff Aronson did testify in the present tense that it presently has the first or second most shown commercial, but this is unhelpful to determine the secondary meaning of "Cash4Gold" before September of 2008. No Conagra factor is satisfied.

Next, Aronson testified that Plaintiff has advertised with the automobile racing league NASCAR since the first or second quarter of 2008. The documentary evidence supporting this claim shows Plaintiff's mark "Cash4Gold" affixed prominently to the car of driver Brandon Knupp, although it is dated August 12, 2008. See Pl. Ex. 6. There was no evidence as to the approximate size of the NASCAR fan base. Likewise, no evidence showed Mr. Knupp's success on the NASCAR circuit or otherwise demonstrated the recognition of this advertisement or the amount of sales attributable to it. Thus, while the length and manner of advertising has been demonstrated, the Court is unable to find conclusively as to the third and fourth Conagra factors: efforts made by plaintiff to promote a conscious connection in the public's mind between the mark and the service provided, and the extent to which the public actually identifies the mark with the plaintiff's venture. Conagra, 743 F.2d at 1513. Finally, Plaintiff is a corporate advertiser with the Washington Wizards. There was no evidence as to the public exposure Plaintiff received as a result of this advertising agreement--other than that it exists--, how long exactly it has been in place, or how much business Plaintiff has

derived from it.  The Conagra factors have not been fleshed out by the evidence.

Considering all the evidence on this point, the Court finds that Plaintiff conclusively established its present market prowess and the large revenue to advertising expediture ratios it now enjoys.  However, there simply was not enough evidence for the Court to find as a factual matter that Plaintiff's mark satisfied the Conagra factors and thereby obtained that quantum of recognition known as secondary meaning before September of 2008.  Moreover, Plaintiff's CEO Jeff Aronson testified that the phrase "cash for gold" has been used "since the days of mining."  He said this while being questioned about the fact that Plaintiff does not presently hold a registration in the Patent and Trademark Office for its mark "Cash4Gold," while another company, Napala Gold, does own one.  When exactly "the days of mining" were is unclear, but his manner indicated that it was a long time in the past.  While said only in passing, the fact that Plaintiff's biggest cheerleader believes that the phrase has been used presumably since the California Gold Rush era seriously undermines its claim to the distinctiveness and exclusiveness of its mark "Cash4Gold" for a precious metal refining business.  Cf. Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1240 (11th Cir. 2008) ("A mark's strength is enhanced where there is little or no third-party use of that mark.") (citation omitted).[4]  The Court finds, based on the

---

[4] The use of "4" does not further enhance the distinctiveness of Plaintiff's mark; it is readily discernable that it means "for,"

evidence presented at the hearing and for purposes of the instant Motion, that the mark's strength is too weak to be protected. Conagra 743 F.2d at 1513.

The second element of determining the strength of the "Cash4Gold" mark is its strength in the marketplace. That is, Plaintiff must help the Court ascertain its degree of recognition in the minds of the relevant customer class. See Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 472 (3d Cir. 2005) ("In examining a mark's commercial strength, we examine marketplace recognition.") (citation omitted). Even an otherwise strong distinctive mark can be "weak" if it is little known among customers. While the analyses are different, the Court can consider the same types of evidence in determining strength in the marketplace as considered in determining secondary meaning. See McCarthy, supra § 11:82. Other than what was discussed above, there was no additional evidence introduced to demonstrate the strength in the marketplace of Plaintiff's mark prior to September of 2008. And, as above, the evidence on this point was insufficient.

The Court finds for purposes of the instant Motion only that Plaintiff's mark is weak for the relevant time, prior to September

---

which is merely descriptive, Mr. Aronson's arguments to the contrary notwithstanding. Moreover, the fact that Plaintiff pays by check and not hard currency does not render the "Cash" in Cash4Gold non-descriptive. "Cash" is understood to mean "money," which includes payment by check. See The American Heritage Dictionary, Second College Edition 244 (1985) (defining "cash" as "Payment for goods or services in money or by check").

of 2008. Further, because it is not inherently distinctive and was not shown to have established secondary meaning, it is not actionable at all under § 43(a) of the Lanham Act. McCarthy, supra § 27:13. Thus, Plaintiff has not established a likelihood of success on the merits of its false designation of origin claim.

### Trademark Claims - False Advertising

Plaintiff's final set of claims involves a violation of § 43(a) of the Lanham Act by way of false advertising. To establish a likelihood of success on the merits of this claim, Plaintiff must demonstrate the following: (1) the advertisements of Defendant were false or misleading, (2) they deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the advertised service affects interstate commerce, and (5) Plaintiff has been--or is likely to be--injured as a result of the false advertising. Axiom Worldwide, 522 F.3d at 1124.[5]

Whether an advertisement is false or misleading is a distinction that must be made, and an important one at that. Literal falsity is a question of fact. Axiom Worldwide, 522 F.3d at 1225 n.12. The Court must first analyze what message is conveyed by the advertisement, even implicitly, and then determine whether that message is false. Time Warner Cable, Inc. v. DIRECTV,

---

[5] The Court will assume for purposes of this Order that the websites at issue affected interstate commerce and that Plaintiff is likely to be injured as a result of them. Thus, the fourth and fifth elements are satisfied.

17

Inc., 497 F.3d 144, 158 (2d Cir. 2007) (cited in Axiom Worldwide, 522 F.3d at 1225 n.12); see also Scotts Co. v. United Indus. Corp., 315 F.3d 264, 274 (4th Cir. 2002) (cited in Axiom Worldwide, 522 F.3d at 1225 n.12).

Several advertisements are at issue.  First, sub-affiliates advertising for Defendant placed sponsored links on Google asking the viewer "See our Super Bowl Ad?"  Pl. Ex. Nos. 20 & 22.  These are literally false because they indicate to the viewer that the company placing those links advertised during the Super Bowl.  Not only did Plaintiff not place those sponsored links, but Plaintiff was the only gold buyer who advertised during the Super Bowl.  Thus, they are false.  Time Warner Cable, 497 F.3d at 158.  Second, the advertisements containing the name under which Plaintiff does business, Cash4Gold, are also false.  Pl. Ex. Nos. 26, 30, 31, & 33.  They imply that Plaintiff, who does business as Cash4Gold, is the operator of those websites and that the consumer doing business through those websites is doing business with Plaintiff.  Because that is not true, those advertisements are literally false.  Time Warner Cable, 497 F.3d at 158.  The first element is satisfied.

The second element is customer deception.  Because Plaintiff has demonstrated the literal falsity of several of Defendant's advertisements, there is no need to prove that they actually deceived any customer.  Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002).  The second element is satisfied.

Even if an advertisement is found to be literally false,

making actual deception immaterial, Plaintiff must also prove that the false advertisements had a material effect on consumers' purchasing decisions.  <u>Axiom Worldwide</u>, 522 F.3d at 1226. Materiality to customer purchasing decisions is important to a finding of a substantial likelihood of success on the merits because "not all deceptions affect consumer decisions." <u>Johnson & Johnson</u>, 299 F.2d at 1250.  At the hearing Plaintiff offered no evidence to establish that the literally false advertisements were material to any customer's purchasing decision.  Because it bears the burden to establish this, there is no basis in the record to so find, and the Court must hold that Plaintiff is unlikely to succeed on the merits of its false advertising claim.  See <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997) (finding no injunction warranted on advertisements that were literally false but irrelevant to consumer decisions) (cited in <u>Johnson & Johnson</u>, 299 F.3d at 1250).

### III.

Plaintiff did not establish a likelihood of success on the merits for any of its claims.  Therefore, it is not entitled to a preliminary injunction for the conduct complained of in this action.  While stating the obvious, the Court desires to make plain that this ruling is only on the basis of the evidence introduced at the hearing held on the instant Motion.  The presentation therein was given by lawyers who strenuously defended the good faith claims held by both sides.  However, the presentation, by both sides, did not conform to the model presented in the cases cited in this Order

19

and others binding in this Circuit. Should evidence supporting a judgment in favor of either side exist, the Court awaits presentation of the same in an orderly fashion cleaving to the analysis presented in the case law. Lastly, the Court seeks to make one further point directed at Defendant. While the instant Motion is denied, should Plaintiff proceed on its claims for infringement of its intellectual property rights, the Court will not look kindly on behavior during the pendency of this action that at a later stage is conclusively proved to be infringing. Though the instant Motion is denied, Defendant would do well to err on the side of being risk-adverse rather than toeing the line of infringing conduct.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Plaintiff Green Bullion Financial Services, LLC's Motion For Preliminary Injunction (DE 8) be and the same is hereby **DENIED.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this   22nd   day of June, 2009.

WILLIAM J. ZLOCH
United States District Judge

Copies furnished:

All Counsel of Record